**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KHONDKER NASREEN,

   *Plaintiff*,

  v.              Civil Action No. 20-1867 (TJK)

CAPITOL PETROLEUM GROUP, LLC et al.,

   *Defendants*.

## <u>MEMORANDUM OPINION</u>

Plaintiff operates a gas station under a franchise with Defendant Anacostia Realty, LLC. Anacostia leases the gas station to Plaintiff and provides her with gasoline.  Defendant Capitol Petroleum Group, LLC helps Anacostia provide those services.  A few years ago, Anacostia accused Plaintiff of failing to meet her contractual obligations, and it tried to terminate their franchise agreement.  Plaintiff then sued, claiming that Defendants have breached the parties' contracts and applicable statutes—specifically, the Petroleum Market Practices Act and, in Anacostia's case, the Robinson-Patman Act.  She also presses an unjust-enrichment theory against both Defendants. Defendants now move for summary judgment.  Because Plaintiff has not produced evidence supporting her claims, the Court will grant that motion in full.

### I. Background

Anacostia owns the gas station Plaintiff operates and wholesales the gasoline she retails. ECF No. 69-1 ¶¶ 3, 7.  Capitol issues invoices for Anacostia and notifies Plaintiff of transactions between Plaintiff and Anacostia.  *See* ECF No. 60-4 at 5; ECF No. 68-3 at 5; ECF No. 69-1 ¶ 10. As relevant to this dispute, the parties' relationship comprises two contracts, which the Court calls the lease and the supply agreement.  This section begins by introducing (A) the lease and (B) the

supply agreement, then explains (C) the payment scheme under the parties' franchise and (D) how their relationship deteriorated, and concludes by (E) summarizing the procedural history of this case.

### A.   The Lease

Under the lease, ECF No. 60-4 at 29–51, Anacostia is the lessor of an Exxon-branded gas station in northwest Washington, D.C.  ECF No. 69-1 ¶¶ 1, 7, 9.  Although the lease would have otherwise expired during this case, the parties have agreed to continue it while the case is pending.  *Id.* ¶ 24; ECF No. 14 at 1–2.  Plaintiff and her husband operate the station alongside an on-site convenience store.  ECF No. 69-1 ¶ 4; ECF No. 68-3 at 60.  Eyob Mamo signed the lease on Anacostia's behalf, designating himself as Anacostia's "President."  ECF No. 60-4 at 45, 51.

The lease says Plaintiff must pay rent on the first of each month.  ECF No. 69-1 ¶ 26.  But Anacostia has allowed her to pay rent in arrears in four equal monthly payments.  *Id.* ¶ 46.  The lease permits Anacostia to take those payments by debiting Plaintiff's bank account via electronic funds transfers ("EFTs").  ECF No. 60-4 at 31.  Because Anacostia chose to take payments that way, the lease says Plaintiff must "maintain at all times funds in [her] account sufficient to make payments to [Anacostia] at the time of the EFT transaction."  *Id.*; *see also* ECF No. 68-3 at 5; ECF No. 69-1 ¶¶ 27, 45.

The lease also reserved for Anacostia the right to use the station for "other business uses."  ECF No. 69-1 ¶ 93.  That provision is limited to uses that do not "materially interfere" with Plaintiff's "authorized uses" of the premises.  *Id.*; *see also* ECF No. 60-4 at 34.  Anacostia also enjoys the "exclusive right" to any income derived from qualifying "other business uses."  *See* ECF No. 60-4 at 34; ECF No. 69-1 ¶ 93.

Based on that provision, Anacostia leased the station's canopy roof to Verizon Wireless to install and operate an antenna.  ECF No. 69-1 ¶ 92.  None of Plaintiff's business operations happen

above or on top of the canopy.  *Id.* ¶ 94.

### B.    The Supply Agreement

Under the supply agreement, Plaintiff must buy gasoline from Anacostia.  *See* ECF No. 60-4 at 53–71.  Like the lease, the supply agreement provided for a fixed term, but the parties have agreed to keep it effective while this case is pending.  *See id.* at 53; ECF No. 14 at 1–2.  Mamo again signed the supply agreement as "President" of Anacostia.  ECF No. 60-4 at 69, 71.

The supply agreement sets the price and quantity terms for gasoline sales between Plaintiff and Anacostia.  On the former point, it uses an "open price term."  ECF No. 69-1 ¶ 30.  That is, the "price per gallon to be paid by [Plaintiff] shall be [Anacostia]'s price in effect at the time loading commences for dealers of the same class and in the same trade area as [Plaintiff]."  ECF No. 60-4 at 71.  Like her rent payments, Plaintiff paid for gasoline by EFTs.  ECF No. 69-1 ¶ 35.  So the supply agreement, like the lease, required Plaintiff to maintain a bank-account balance sufficient to cover the payments.  *Id.* ¶¶ 36–37; ECF No. 60-4 at 54.

As for the quantity term, the supply agreement set annual minimum quantities for Plaintiff to buy.  ECF No. 60-4 at 70.  Specifically, it directed Plaintiff to buy at least 600,000 gallons of gasoline in the first contract year, 625,000 gallons in the second, and 650,000 gallons in the third.  *Id.*; ECF No. 69-1 ¶ 34.  The parties included those requirements because, under an earlier, similar agreement, Plaintiff's purchases "declined steadily and dramatically."  ECF No. 69-1 ¶¶ 64, 67–69.  So when the parties negotiated the renewal of their franchise, Plaintiff proposed—and Anacostia accepted—the above quantity restrictions.  *Id.* ¶¶ 64–65.  The parties designated those restrictions as "essential prerequisite[s]" for the supply agreement.  *Id.* ¶¶ 71, 73.

### C.    Payments Under the Franchise

To implement the lease and supply agreement, Anacostia maintains an account for Plaintiff, which the parties call her "ANA Account."  ECF No. 69-1 ¶¶ 38–39.  The ANA Account

records the transactions between Plaintiff and Anacostia. *See id.* The account is debited for the amounts Plaintiff owes Anacostia for rent and gasoline purchases, and it is credited for amounts that Anacostia owes Plaintiff. *See id.* The credits consist mostly of reimbursements for retail sales of gasoline by credit or debit card. *Id.* ¶ 40. When a customer pays by card, the payment is routed first to ExxonMobil. *Id.* ¶ 41. ExxonMobil takes a processing fee and forwards the remainder to Anacostia. *Id.* Anacostia, in turn, credits Plaintiff's ANA Account in that amount. *Id.* ¶ 42.

Thus, each day, Plaintiff's ANA Account records some combination of credits and debits. ECF No. 69-1 ¶ 44. At the end of the day, those amounts are added together to produce either a net credit or net debit. *See id.* Anacostia withdraws that figure from (if it is a net debit) or deposits that figure into (if it is a net credit) Plaintiff's bank account. *See id.*

### D.      Attempted Termination of the Franchise

Anacostia accused Plaintiff of breaching the contract in two ways. The first relates to the parties' payment scheme. Plaintiff sometimes had insufficient funds in her bank account to cover Anacostia's attempts to withdraw funds when her daily ANA Account balance was a net debit. ECF No. 69-1 ¶¶ 50–56. Because of those deficiencies, her bank dishonored (or "bounced") EFTs. *See id.* ¶ 50. That happened twice in March 2020, *id.* ¶¶ 51–52, and five more times between April 2020 and January 2022, *id.* ¶¶ 53–56. The amounts of the bounced EFTs ranged from about $6,000 to $18,000. *See id.* ¶¶ 51–55.

Second, Plaintiff did not meet the supply agreement's minimum-gasoline-purchase amounts. She bought 402,554 gallons in the first year, 284,135 gallons in the second year, and 347,097 gallons in the third year, falling, respectively, below the required 600,000, 625,000, and 650,000 gallons. *Id.* ¶¶ 75–77.

Defendants identified those issues in a purported termination notice. On April 6, 2020, they told Plaintiff they would terminate the franchise on July 8, 2020. ECF No. 60-4 at 93–94; *but*

*see* ECF No. 14 (staying that termination during this case).  They cited the two bounced EFTs from March 2020.  ECF No. 60-4 at 93–94; ECF No. 69-1 ¶ 81.[1]  And they cited Plaintiff's failure to purchase enough gasoline.  ECF No. 60-4 at 93–94; ECF No. 69-1 ¶ 83.

The termination notice slightly conflated Anacostia and Capitol.  It listed Anacostia as the franchisor and Plaintiff as the franchisee, and its letterhead designated the sender as "Anacostia Realty, LLC" and included Anacostia's address.  ECF No. 60-4 at 93.  As with the lease and supply agreement, Mamo signed the notice, but this time, he listed his title as "Managing Member" of "Capitol Petroleum Group, LLC."  ECF No. 60-4 at 94.[2]

### E.   Procedural History

After receiving the termination notice, Plaintiff sued Anacostia and Capitol pro se.  *See generally* ECF No. 1.  Then she retained counsel and amended her complaint.  *See generally* ECF No. 19 ("Compl.").  There, she pleaded four claims.  In Count I, she claims Defendants violated the Petroleum Market Practices Act ("PMPA") in their attempt to terminate the franchise.  *Id.* ¶¶ 18–25.  In Count II, she claims Anacostia violated the Robinson-Patman Act by charging her discriminatory prices for gasoline.  *Id.* ¶¶ 26–31.  In Count III, she claims Defendants breached the lease and supply agreement.  *Id.* ¶¶ 32–42.  In Count IV, she claims Defendants were unjustly enriched by the Verizon lease and their failure to share its proceeds with her.  *Id.* ¶¶ 43–47.  She seeks damages and various forms of declaratory and injunctive relief.  *Id.* at 12–13.

---

[1] The remaining five EFTs bounced after Anacostia sent the notice.  *See* ECF No. 69-1 ¶ 82.

[2] The parties dispute Mamo's title.  Plaintiff says Mamo was the "managing member" of both Capitol and Anacostia, while Defendants say he was the "president" of Capitol's and Anacostia's managing members.  ECF No. 69-1 ¶ 97.  Plaintiff also states in her opposition to Defendants' motion for summary judgment that Mamo is "[Capitol's] President."  ECF No. 68 at 17.

Defendants now move for summary judgment on Count I. ECF No. 60-2 at 12–22. They also ask for judgment on the pleadings or, alternatively, for summary judgment, on Counts II–VI. *Id.* at 22–36. Plaintiff opposes Defendant's motion but does not cross-move for summary judgment. *See generally* ECF No. 68.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if a dispute over it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

To survive a motion for summary judgment, Plaintiff, the nonmoving party, must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted). After "adequate time for discovery," the Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. If the evidence favoring the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). And while the nonmoving party "is entitled to all justifiable inferences," "legal conclusions 'cloaked' as facts are not sufficient to

create a genuine issue of material fact." *United States v. BCCI Holdings (Luxembourg), S.A.*, 977 F. Supp. 1, 6 (D.D.C. 1997) (citation omitted), *aff'd*, 159 F.3d 637 (D.C. Cir. 1998).[3]

### III.   Analysis

Defendants move for summary judgment on all counts.  Capitol, which is named only in Counts I, III, and IV, says it cannot be liable for those counts because it had no contract with Plaintiff.  ECF No. 60-2 at 12–14.  As for Anacostia, on Count I, it says its termination was lawful. *Id.* at 14–22.  On Count II, it argues that Plaintiff's evidence does not support the elements of a Robinson-Patman Act claim.  *Id.* at 22–27.  On Count III, it argues Plaintiff has not produced enough evidence to show a breach of contract.  *Id.* at 27–34.  On Count IV, it contends that the lease precludes an unjust-enrichment claim based on its contract with Verizon.  *Id.* at 34–35.  Finally, both Defendants argue that Plaintiff lacks standing to seek damages.  *Id.* at 35.  On top of her responses to those arguments, Plaintiff says Defendants' motion should be denied for noncompliance with the Court's standing order.  ECF No. 68 at 14–15.

The Court finds that Defendants are entitled to judgment as a matter of law.  It will not deny Defendants' motion for noncompliance with its standing order because both parties failed to comply and because the noncompliance was immaterial.  It will grant summary judgment for

---

[3] The Court need not consider Defendants' request for judgment on the pleadings.  When "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Thus, courts have construed motions for judgment on the pleadings that alternatively seek summary judgment as motions for summary judgment when the defendant "attache[s] various exhibits . . . that both parties have relied upon in their briefing" that are "arguably outside the scope of the pleadings" and when "both parties have submitted statements of material fact."  *Langley v. Napolitano*, 677 F. Supp. 2d 261, 263 (D.D.C. 2010); *see also Dean v. Walker*, 876 F. Supp. 2d 10, 12 (D.D.C. 2012).  Here, both sides provided statements of material fact as required by Local Civil Rule 7(h) because Defendants moved for summary judgment on Count I.  *See* ECF Nos. 60-3, 68-2, 69-1.  And both parties also provide and rely on considerable extra-pleading materials.  The Court must consider those materials to decide the motion as to Count I.  So it will not exclude them in resolving the motion as to Counts II–VI, and will thus treat Defendants' whole motion as one for summary judgment.

Capitol because the Court agrees that the evidence fails to establish a contractual relationship between Capitol and Plaintiff. It will grant summary judgment on all counts for Anacostia because Plaintiff's evidence does not create a material issue of fact on any of her claims. That conclusion obviates Defendants' argument that Plaintiff lacks standing to get damages. Thus, the Court will grant Defendants' motion in full.

### A.    The Parties' Noncompliance with the Standing Order Does Not Warrant Denying Defendants' Motion

Plaintiff observes that Defendants did not provide their statement of material facts in a two-column table. ECF No. 68 at 14–15; *see also* ECF No. 8 ¶ 12(a) (ordering that format). Defendants concede the "error," but note that Plaintiff could and did correct it. ECF No. 69 at 24. And they retort that Plaintiff, in her opposition, disregarded the standing order to provide a counter-statement of disputed facts in editable form. *Id.*; *see also* ECF No. 8 ¶ 12(a). No matter, though, because Defendants "easily" converted that too. ECF No. 69 at 24.

Compliance gaffes notwithstanding, the Court will not deny Defendants' motion. The cases Plaintiff cites to support her request all involved material violations. *See* ECF No. 68 at 15. Here, the parties were still able to brief the motion, and the Court was able to consider the parties' arguments. Especially because the compliance issues have since been remedied, the Court declines Plaintiff's invitation to levy the extreme sanction of automatic denial.

### B.    Capitol Is Entitled to Summary Judgment

Capitol says it has no "contractual, franchise, motor fuel supply, or other relationship" with Plaintiff, so it cannot be liable for any of the counts alleged against it. ECF No. 60-2 at 12. The Court agrees.

Plaintiff does not argue that Capitol is a party to the lease or the supply agreement. ECF No. 69-1 ¶¶ 2–3, 14. Although Plaintiff says Capitol issued her invoices and sent her EFT

notifications, she does not claim that it otherwise owns or operates gas stations or sells gasoline. *Id.* ¶ 11; ECF No. 60-4 at 2. Accordingly, Capitol receives no revenue from Plaintiff's rent payments or gasoline purchases. ECF No. 69-1 ¶ 12; ECF No. 60-4 at 2. Nor is it a party to or a beneficiary of Anacostia's lease with Verizon. *See* ECF No. 69-1 ¶ 92; ECF No. 60-4 at 159.

Yet the counts against Capitol rest on those contractual arrangements. Because Capitol is not a party to them, Plaintiff cannot hold it liable for any alleged breaches. Count I arises under the PMPA, but the PMPA allows claims only against a "franchisor." 15 U.S.C. § 2805(a). Anacostia, not Capitol, is the franchisor here. *See* ECF No. 60-4 at 30, 53, 93 (listing only Anacostia in, respectively, the supply agreement, lease, and termination notice). The story is the same for Plaintiff's breach-of-contract claim, Count III, because that claim relies on a contractual relationship. ECF No. 69-1 ¶ 14; *see also Parks v. Fed. Home Loan Bank of San Francisco*, No. 19-cv-883 (JEB), 2020 WL 417795, at *5 (D.D.C. Jan. 27, 2020) ("As non-parties, . . . [the defendants] cannot breach the terms of the contract, either express or implied."); *Greggs v. Autism Speaks, Inc.*, 935 F. Supp. 2d 9, 13 (D.D.C. 2013) ("[P]laintiff cannot assert a claim for breach of contract against the individual defendants because they were not parties to the alleged contract."). And Count VI, the unjust-enrichment claim, fails because the supposed "benefit" that enriched Defendants came from the Verizon lease. Compl. ¶ 46. But only Anacostia reaps rents from that arrangement. ECF No. 69-1 ¶ 92; ECF No. 60-4 at 159. Thus, even if the benefit were unjust, Capitol has nothing to do with it. Capitol is entitled to summary judgment on all counts.

Resisting that conclusion, Plaintiff invokes a novel alter-ego theory not alleged in her complaint. In short, she claims that Capitol and Anacostia have so blurred the lines between them and disregarded corporate formalities that a jury could hold Capitol liable for Anacostia's actions. ECF

No. 68 at 15–17.  Even if the Court were to consider Plaintiff's unpleaded theory, Capitol would still be entitled to summary judgment.

Corporate veil-piercing is an "extraordinary procedure" reserved for "extreme circumstances." *Schattner v. Girard, Inc.*, 668 F.2d 1366, 1370 (D.C. Cir. 1981).  In the District of Columbia, "a party seeking to pierce the corporate veil has the burden to make a substantial showing that the corporation is really a dummy or sham for another dominating entity." *Flocco v. State Farm Mut. Auto. Ins.*, 752 A.2d 147, 155 (D.C. 2000) (quotation omitted).

Plaintiff's showing falls well short.  She relies entirely on the fact that Mamo signed the termination notice as "Managing Member" of "Capitol Petroleum Group, LLC." *See* ECF No. 60-4 at 94.  But it is unsurprising that Mamo signed that notice because he also works for Anacostia, the franchisor.  Indeed, Mamo signed off as "President" of Anacostia on the all the agreements creating the franchise—the lease, the supply agreement, and even the parties' 2017 settlement agreement.  *See* ECF No. 60-4 at 45, 69, 75; *see also* ECF No. 60-4 at 169 (showing that Mamo signed the Verizon lease as Anacostia's "President").  Though it may have been clearer had he listed his Anacostia title on the notice, that he did not is a far cry from "extreme circumstances" reflecting a "sham" or a "dummy" corporation.  *Schattner*, 668 F.2d at 1370; *Flocco*, 752 A.2d at 155.  Moreover, the notice was written on Anacostia letterhead with Anacostia's address, and it states that Plaintiff's franchise with "Anacostia Realty, LLC, *as franchisor*," would be terminated.  ECF No. 60-4 at 93 (emphasis added).  Plaintiff even admits that "*Anacostia* forwarded" her notice, not Capitol.  ECF No. 69-1 ¶ 78 (emphasis added).

Plaintiff identifies no other facts—disputed or otherwise—to support her veil-piercing theory.  Instead, she faults *Capitol* for not producing "evidence demonstrating its role, or lack thereof, in the supply chain of motor fuels to service station dealers."  ECF No. 68 at 16.  But Plaintiff, as

the "party seeking to pierce the corporate veil," carries the burden to establish her theory.  *Flocco*,
752 A.2d at 155.  And of course, more generally, she has the burden at the summary-judgment
stage to provide facts to support her claim, which she has failed to do.  *Celotex*, 477 U.S. at 324.
In sum, no reasonable jury could conclude that Capitol is a dummy company of Anacostia such
that it is liable for Counts I, III, or IV.  The Court will therefore grant summary judgment for
Capitol on all counts against it.

### C.   Anacostia Is Entitled to Summary Judgment on Count I Because It Has Not Violated the PMPA

Anacostia moves for summary judgment on Count I, arguing that it could lawfully termi-
nate the franchise and so did not violate the PMPA.  It offers two reasons for that conclusion: the
bounced EFTs and Plaintiff's failure to buy the required minimum quantities of gasoline.  ECF
No. 60-2 at 14–22.  The Court agrees that Plaintiff's bounced EFTs justified Anacostia's termina-
tion of the franchise, so it need not consider the second theory.

### 1.   Termination Based on Plaintiff's Failure to Pay

The PMPA permits a "termination of a franchise" based on the "occurrence of an event
which is relevant to the franchise relationship and as a result of which termination of the franchise
or nonrenewal of the franchise relationship is reasonable."  15 U.S.C. § 2802(b)(2)(C).  It lists
twelve such qualifying "events," including a "failure by the franchisee to pay to the franchisor in
a timely manner when due all sums to which the franchisor is legally entitled."  *Id.* § 2802(c)(8).
Once a court finds that one of the enumerated events occurred—and that the franchisor terminated
a franchise based on that event—a court need not also assess reasonableness.  *See Hinkleman v.
Shell Oil Co.*, 962 F.2d 372, 377–79 (4th Cir. 1992) (citing cases).

11

The parties agree that Plaintiff twice failed to pay Anacostia "all sums" "when due." 15 U.S.C. § 2802(c)(8).[4]  Both failures resulted from bounced EFTs in March 2020.  ECF No. 69-1 ¶¶ 52–53.  First, Anacostia tried to withdraw funds for a net debit of nearly $18,000, but Plaintiff's bank bounced the EFT for "insufficient funds."  *Id.* ¶¶ 50–51.  A few days later, the same thing happened after an attempted withdrawal of nearly $14,000.  *Id.* ¶¶ 50, 52.  Thus, when Anacostia sent Plaintiff the termination notice on April 6, 2020, it stated that her "failure to pay in a timely manner when due all sums owed to the Franchisor" was a "ground[] for termination."  ECF No. 60-4 at 93.

Far from disputing those facts, Plaintiff deflects with three unconvincing responses.  First, she says she "ultimately" paid the amounts owed.  ECF No. 68 at 22–23.  But that argument misses the point.  Anacostia acknowledges that Plaintiff paid the amounts within a few days of getting the termination notice.  *See* ECF No. 68-3 at 6, 105; ECF No. 69-1 ¶ 124.  But the statutory question is whether Plaintiff still failed to pay "all sums" owed to Anacostia "in a timely manner *when due*." 15 U.S.C. § 2802(c)(8) (emphasis added).  An eventual payment could not cure the payments' untimeliness.  *See, e.g.*, *Shell Oil Co. v. Kozub*, 574 F. Supp. 114, 118 (N.D. Ohio 1983).  Because Plaintiff acknowledges her "deficiency" in timely paying, there is no material dispute of fact on this point.  ECF No. 68 at 23; *see also* ECF No. 69-1 ¶¶ 50–52.

Second, Plaintiff says the PMPA required Anacostia to give her time to cure the deficiency. ECF No. 68 at 23 (citing 15 U.S.C. § 2802(b)(2)(B)).  Not so.  Anacostia's termination on this basis invoked a different portion of the statute—Section 2802(b)(2)(*C*)—which does not contain the requirement on which Plaintiff relies.  ECF No. 60-4 at 93.  Thus, Anacostia did not have to

---

[4] Anacostia notes that Plaintiff later failed to pay sums owed five other times (for a total of seven times).  ECF No. 69 at 11; *see* ECF No. 69-1 ¶¶ 53–56.  But these later five failures happened after Anacostia sent the Notice on April 6, 2020.  ECF No. 69-1 ¶ 82.

give her an opportunity to cure.  *See Glenside W. Corp. v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 761 F. Supp. 1100, 1117 (D.N.J. 1991); *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 59 (2d Cir. 1984).  That it chose not to is immaterial.

Third, Plaintiff blames her failure to pay on a "temporary shortage of funds in [her] bank account."  ECF No. 68 at 23.  It is unclear what Plaintiff means.  Perhaps she means to say that her tardiness was not a "failure" under the PMPA, which is defined to exclude something "beyond the reasonable control of the franchisee."  *See* 15 U.S.C. §§ 2801(13)(B), 2802(c)(8).  If that is her point, she must show that her inability to pay was outside her control.  But she does not even cite that statutory definition, much less show that she meets the standard.

Plaintiff's argument amounts to saying that she could not help breaching the contract because she had breached the contract.  "[T]he PMPA specifically provides that nonpayment" violates the franchise agreement and justifies termination, which "destroys any contention that nonpayment should be construed as matter beyond the franchisee's control."  *Cal. Petroleum Distribs. Inc. v. Chevron U.S.A. Inc.*, 589 F. Supp. 282, 288 (E.D.N.Y. 1984).  The supply agreement required Plaintiff to maintain a sufficient balance to pay her obligations under it.  ECF No. 69-1 ¶ 37; ECF No. 60-4 at 54.  Her tautology does not show that her nonpayment was somehow beyond her "reasonable control."  *See* 15 U.S.C. § 2801(13)(B).

Plaintiff has not even shown that she was short on cash.  She had five bank accounts associated with the station.  ECF No. 69-2 at 1.  For four of those accounts, she has provided incomplete information about her financial position during the period when she made late payments.  *Id.* ¶ 4. The single account for which she has provided full information reveals transactions involving considerable funds, including transactions in which Plaintiff paid debits to Anacostia.  ECF No. 68-3 at 70–72.  In total, Plaintiff spent $98,921.91 in March 2020.  *Id.*  She never explains why she

could not satisfy the amounts in dispute.  And without a complete financial picture, a reasonable juror could not conclude that she was so short on cash that she could not timely pay Anacostia—even if that were beyond her reasonable control.

For those reasons, Plaintiff has established no genuine dispute of material fact regarding her failure timely to pay Anacostia "all sums" "when due."  15 U.S.C. § 2802(c)(8).  Thus, Anacostia had a right to terminate the franchise under Section 2802(b)(2)(C).

### 2.       Anacostia Satisfied the PMPA's Notice Requirements

Plaintiff also argues that Anacostia's termination was invalid for failure to meet the PMPA's notice requirements.  Specifically, she says Capitol, not Anacostia, sent the notice.  ECF No. 68 at 17–19.  That argument starts from the correct premise that "the *franchisor* shall furnish notification" of a termination.  15 U.S.C. § 2804(a) (emphasis added).  From there, she observes that Mamo signed the termination notice as the "Managing Member" of Capitol, which she interprets to mean that he sent the notice on Capitol's behalf.  ECF No. 68 at 18; ECF No. 60-4 at 94.

That lone fact cannot bear the weight Plaintiff assigns it.  As the Court has already explained, everything else in the record confirms that Anacostia sent the notice.  The notice used Anacostia's letterhead, bore Anacostia's address, and identified Anacostia as the "Franchisor."  ECF No. 60-4 at 93–94.  Mamo's signing of the termination notice is unsurprising because he had signed the lease and supply agreement as the "President" of Anacostia.  *Id.* at 45, 51, 69, 71.  Plaintiff even admits "*Anacostia* forwarded [her the] notice of termination."  ECF No. 69-1 ¶ 78.  No reasonable jury could ignore those facts and conclude that Mamo sent the notice on Capitol's behalf.  Thus, Anacostia gave proper notice, and it is entitled to summary judgment on Plaintiff's PMPA claim, Count I.

**D.**     **Anacostia Is Entitled to Summary Judgment on Count II Because It Did Not Violate the Robinson-Patman Act**

Plaintiff's second claim is that Anacostia violated Section 2(a) of the Robinson-Patman Act by selling gasoline to two or more buyers, including Plaintiff, at "different, discriminatory prices." Compl. ¶ 27. Anacostia moves for summary judgment, arguing that Plaintiff has not supported this claim with sufficient evidence. ECF No. 60-2 at 25–27. The Court agrees.

A Section 2(a) claim has nine elements: "(1) two or more consummated sales, (2) reasonably close in point of time, (3) of commodities, (4) of like grade and quality, (5) with a difference in price, (6) by the same seller, (7) to two or more different purchasers, (8) for use, consumption, or resale within the United States or any territory thereof, (9) which may result in competitive injury.'" *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 44 (D.D.C. 2007) (citation omitted); *see also* 15 U.S.C. § 13(a).

Plaintiff's showing falls well short of that mark. Most of her opposition entailed regurgitating the allegations in her complaint. *See* ECF No. 68 at 24. But the time for allegations has passed. As for evidence, Plaintiff offers three statements. First, she says she spoke with one of Anacostia's district managers, who told her "the price she paid for gas was higher than that of other gas stations that [Anacostia] was the landlord and had gas supply agreements with." ECF No. 60-5 at 11, 13; *see also* ECF No. 69-1 ¶¶ 111–12. Second and third, she says two gas station owners near her told her "she was paying a higher price" than they were. ECF No. 60-5 at 13; ECF No. 69-1 ¶¶ 113–14.

At the outset, Anacostia correctly challenges the latter two statements as inadmissible hearsay. *See* ECF No. 69-1 ¶¶ 112–14. In opposing a summary-judgment motion, a nonmovant must produce evidence "capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). When a nonmovant's

"proffered evidence is 'sheer hearsay, it counts for nothing on summary judgment.'" *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1315 (D.C. Cir. 2021) (citation omitted). The alleged remarks of other gas-station owners are out-of-court statements offered for the truth of the matters asserted. *See* Fed. R. Evid. 801(c). Those statements are inadmissible hearsay, and no exception to the rule against hearsay applies. Thus, they "count[] for nothing." *Klayman*, 6 F.4th at 1315. Plaintiff's claim must sink or swim based on the alleged statement of Anacostia's district manager.[5]

But even if the Court were to admit all the statements as evidence, it would make no difference. The statements are not "sufficient to establish" each of the above elements of a Section 2(a) claim at this stage. *Celotex*, 477 U.S. at 322. Plaintiff fails to identify two "consummated sales," their closeness in time, or the prices paid. *City of Moundridge*, 471 F. Supp. 2d at 44. Nor does she have evidence that the gasoline purchased was of "like grade and quality." *See id.* With only Plaintiff's bare recitation of the elements of her claim, *see* Compl. ¶ 27, no reasonable jury could find facts constituting a Section 2(a) claim.

Plaintiff barely attempts to argue otherwise. Rather than point to evidence, she asserts that "[t]here is a clear and obvious dispute between the parties as to whether Defendants discriminated against [her] with respect to pricing of gasoline offered to her in comparison to other franchises." ECF No. 68 at 24. But that is a legal conclusion. *BCCI Holdings*, 977 F. Supp. at 6. Relevant disputes at this stage are over the facts themselves, not the conclusions the parties wish to draw from them. That Plaintiff has offered few facts—meaning that the parties factually dispute very little—does not excuse her of her burden to "put up or shut up." *Nessar v. District of Columbia*, 962 F. Supp. 2d 234, 242 (D.D.C. 2013) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th

---

[5] Defendants do not challenge the admissibility of that statement. *See* ECF No. 69-1 ¶ 111. In any event, it appears to be a statement of a party opponent made by the manager in a representative capacity, and so not hearsay. *See* Fed. R. Evid. 801(d)(2)(A).

Cir. 2008)).  She has not met that burden.  So Anacostia is entitled to summary judgment on Count II.

> ### E.  Anacostia Is Entitled to Summary Judgment on Count III Because It Did Not Breach Either the Lease or the Supply Agreement

Plaintiff's third claim is for breach of contract.  ECF No. 60 at 27.  She posits five reasons Anacostia breached the lease and supply agreement: (1) it withheld credit-card reimbursements to try to drive her out of business; (2) it charged her higher prices for gasoline than it charged similarly situated sellers; (3) it leased part of the premises to Verizon without sharing the proceeds with her; (4) it prematurely deducted rent payments from Plaintiff's bank account and collected more rent than she had to pay; and (5) it unjustifiably terminated the franchise.  *See* Compl. ¶¶ 33–41.

To "prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Mawakana v. Bd. of Trs. of Univ. of the D.C.*, 926 F.3d 859, 869 (D.C. Cir. 2019) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).  For the below reasons, Plaintiff has failed to provide sufficient evidence to support these elements for any of the alleged breaches, so the Court will grant Anacostia summary judgment on Count III.

> #### 1.  Withholding Credit Card Reimbursements

Plaintiff's first breach theory is that Anacostia did not timely reimburse her for credit-card payments.  Compl. ¶ 33.  In opposing Defendants' motion, she says her evidence "clearly demonstrate[s] Defendants withheld credit card payments without justification on at least three separate, prolonged occasions" in April, May, and June 2020.  ECF No. 68 at 29.  Anacostia disagrees, ECF No. 60-2 at 29–31, and so does the Court.

Recall that, at the summary-judgment stage, "legal conclusions 'cloaked' as facts are not sufficient to create a genuine issue of material fact." *BCCI Holdings*, 977 F. Supp. at 6. The D.C. Circuit has also explained the "importance of filing a proper [Local Civil Rule 7(h)(1)] statement" of material facts, which allows district courts "to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150–51 (D.C. Cir. 1996). By requiring the parties to "crystallize for the district court the material facts and relevant portions of the record," that rule saves district courts from having to "sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quotation omitted) (alteration in original).

Plaintiff's theory fails on those bases. To support her conclusion that Anacostia "improperly withheld payments in April, May, and June 2020," ECF No. 68 at 29, Plaintiff provides this explanation:

> [D]espite [Plaintiff's] owing no balance to Defendants, [Anacostia] *withheld* credit card payments on both April 12 and 13. . . . Once again, from April 16 through April 23, 2020, despite having no outstanding balance with Defendants, Defendants *withheld* every single credit card payment from [Plaintiff] for eight consecutive days. . . . This conduct continued into May as Defendants *withheld* credit card payments from April 31, 2020 until May 11, 2020. Thus, despite not having paid [Plaintiff] what she was *owed* under the Supply Agreement, Defendants *withheld* payments for nearly two weeks, only to then debit her account for rent, which consequently was returned for insufficient funds. . . .
>
> While [Plaintiff] did have an outstanding balance from May 12, 2020 until June 1, 2020, as of June 2, 2020, her account was *paid in full*. Even as such, per the June 9 EFT and Accounting charts, Defendants *withheld* payments for six additional days, until June 7, 2020 all the while the credit card sale payments *due* to [Plaintiff] ballooned to $22,910.27.

*Id.* at 29–30 (citations omitted) (emphasis altered); *see also, e.g.*, ECF No. 69-1 ¶ 125 (stating that Defendants "withheld credit card" payments on April 12–13 and 16–23).

Whether payments to Plaintiff were "withheld," "owed," or "due" are legal conclusions that depend on contractual interpretation. *See BCCI Holdings*, 977 F. Supp. at 6. After all, her claim is that Anacostia breached the supply agreement by "withholding reimbursement." Compl. ¶ 33–34. Plaintiff's mere assertion that Anacostia "withheld" or "owed" her payments begs the question. With no evidence to back those conclusions up, or reference to any contractual provisions, she disregards her burden to "crystallize for the district court the material facts." *Jackson*, 101 F.3d at 150–51. Given her failure to identify any genuine disputes of material *fact* on this issue, Anacostia is entitled to summary judgment.

Nor are the facts self-evident from the evidence provided. Plaintiff points to several EFT notifications and bank statements. ECF No. 68 at 29–30. Yet she does not pinpoint any specific amounts—either listed or absent. Even more to the point, she does not clarify the amounts Anacostia owed her (and when), so of course she cannot then explain how any figures on the bank statements prove Anacostia withheld *those amounts owed*. Making matters worse, for many dates she references in her opposition, the evidence seems to contradict her conclusion that Anacostia withheld funds. For example, she relies on Exhibit K to say Anacostia "withheld credit card payments on both April 12 and 13" and on "April 16 through April 23." ECF No. 68 at 29. But that document shows that Plaintiff received several credits to her account for credit-card-transaction reimbursements from Anacostia on those dates. ECF No. 68-3 at 85.[6]

It is not the Court's job to explain how Plaintiff's evidence supports her conclusions. *See Jackson*, 101 F.3d at 151. But even if it were, her evidence seemingly does *not* support her conclusions. A reasonable jury, then, could not find for Plaintiff on this theory.

---

[6] Specifically, Anacostia credited her $1,987.14 (on April 12), $2,625.62 (on April 13), $2,314.01 (on April 16), $2,422.77 (on April 17), $2,823.58 (on April 18), $2,646.96 (on April 19), $2,546.99 (on April 20), $2,844.50 (on April 21), and $2,247.44 (on April 22). ECF No. 68-3 at 85.

2.        **Differential Pricing**

Plaintiff's second theory is much like her Robinson-Patman Act claim—that Anacostia charged her "higher prices" for gasoline than "other similarly situated service stations" in the area. Compl. ¶ 35.  Here, she argues that price discrimination breached an "implied duty of good faith and fair dealing that is part of the Supply Agreement."  *Id.*  She claims Anacostia's aim was to support a "pretextual notice of termination" of the franchise, driving her out of business.  *Id.* ¶ 36. Anacostia again challenges the sufficiency of her evidence.  ECF No. 60-2 at 28.  Plaintiff has two responses, but neither carries the day.

First, Plaintiff tries to put the onus on Anacostia to disprove her claim.  She says Anacostia has "conflat[ed] the initial burden," observing that the *movant* "bears the initial responsibility of identifying those portions of the record which it believes demonstrate a total absence of a genuine issue of material fact."  ECF No. 68 at 27 (citing *Celotex*, 477 U.S. at 323).  But, by oversimplify-ing, Plaintiff misses the point.  More precisely, *Celotex* instructs that a movant must "inform[] the district court of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, *if any*,' which it believes demonstrate the absence of a genuine issue of material fact."  477 U.S. at 323 (emphasis added).  On this point, the D.C. Circuit has further said:  "[T]he burden on a defendant moving for summary judgment may be discharged *without factual disproof* of the plaintiff's case; the defend-ant need only identify the ways in which *the plaintiff* has failed to come forward with sufficient evidence to support a reasonable jury to find in her favor on one or more essential elements of her claim."  *Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015) (emphases added).

Anacostia has satisfied that burden.  It argues that the supply agreement's price term allows it to charge different prices to dealers in different classes or trade areas.  ECF No. 60-2 at 28; *see*

*also* ECF No. 69-1 ¶ 30 (identifying no dispute over this "open price term"). Based on that theory, it points out that Plaintiff does not "even allege that Anacostia charged lower prices to other Le-see [*sic*] Dealers in the same price zone or any competitive injury resulting from the alleged differential pricing." ECF No. 60-2 at 28. And it argues that Plaintiff has "no evidence" to support her contractual theory relating to "pricing and damages resulting therefrom." *Id.* Thus, Anacostia has informed "the district court of the basis for its motion," *Celotex*, 477 U.S. at 323, and has appropriately represented its view that there is "no evidence" to identify. ECF No. 60-2 at 28; *see also Grimes*, 794 F.3d at 93.

Second, Plaintiff points to the same facts—the alleged statement of Anacostia's district manager and those of other gas-station operators—on which she based her other price-discrimination claim. *Compare* ECF No. 68 at 28, *with* ECF No. 60-5 at 11–13, *and* ECF No. 69-1 ¶¶ 111–14. As before, that factual showing is seriously lacking. Even if two of her three statements were not inadmissible hearsay, *supra* Section III.D & n.5, they do not address a key fact—the classes of the other stations. The supply agreement, after all, expressly allows Anacostia to charge different prices to dealers in different classes. ECF No. 60-2 at 28.

Besides, even if taken at face value, Plaintiff's evidence leaves chasmic gaps. None of it answers basic questions, such as: How much did Plaintiff pay for gasoline? How much did her counterparts pay? When did those sales happen? Without the ability to answer those questions, no reasonable jury could conclude that Anacostia even charged Plaintiff more than others, let alone other gas stations in the same class as hers. For those reasons, Anacostia is entitled to summary judgment on this theory.

### 3.    The Verizon Lease

Plaintiff's third theory is that Anacostia breached the lease by allowing Verizon to install equipment on the station's canopy without compensating her.  But Anacostia correctly points out that the lease expressly contradicts her.  ECF No. 60-2 at 34–35.

The lease gives Anacostia both the right to allow Verizon to use the canopy and the exclusive right to profit from it.  It provides that Plaintiff may use the "Premises," defined as the station and the convenience store, "solely" "for the operation of a motor fuel dispensing station" and any uses to which Anacostia has consented.  ECF No. 60-4 at 34; *see also* ECF No. 69-1 ¶¶ 4, 93.  Beyond those uses, however, Anacostia "reserve[d] the right to [use] the Premises for other business uses so long as any such use does not materially interfere with [Plaintiff's] authorized use of the Premises."  ECF No. 60-4 at 34; ECF No. 69-1 ¶ 93.  And it "reserve[d] the *exclusive* right to any fees, income, rentals or other revenue generated by such use by [Anacostia]."  ECF No. 60-4 at 34; ECF No. 69-1 ¶ 93.  Thus, to survive summary judgment on this breach-of-contract claim, Plaintiff must provide sufficient facts that would allow a reasonable juror to conclude that Verizon's use of the premises "*materially* interfere[d]" with her authorized use.  ECF No. 60-4 at 34 (emphasis added).

She has not.  One difficulty for her theory is that Verizon may use only the space atop the station's canopy.  *See* ECF No. 69-1 ¶ 92.  Use of that space does not impede customers' access to the gasoline dispensers *below* the canopy.  And Plaintiff admits that "[n]o part of [her] business is conducted above or on top of the canopy."  *Id.* ¶ 94.

Instead, Plaintiff argues that the lease to Verizon deprives her of the "quiet enjoyment" of the station, Compl. ¶ 15, because Verizon personnel often visit and block gasoline pumps, ECF No. 68-3 at 64.  Specifically, she asserts that Verizon's vehicle blocked "two to four pumps out of

the six the gas station maintains . . . continuously for 3-4 days" during monthly visits to the station. *Id.* From those facts, Plaintiff concludes that Verizon's visits "interfer[ed] with [her] efforts and ability to sell gasoline and other products at the Station." *Id.* at 8.

Even if the Court assumes Plaintiff's assertion is enough to create a genuine fact dispute about the frequency of Verizon's visits, that dispute is immaterial. She provides no evidence showing that Verizon's vehicle deterred or prevented customers from buying gasoline, causing her to sell less. For example, she does not provide any evidence that her sales declined (let alone by how much) on days when Verizon's vehicle was present. She does not even provide anecdotal evidence that on these days lines at the operating pumps were longer, or that any customer ever drove away rather than wait. The Verizon vehicle's mere presence a few days a month, even if it sometimes blocked some of the station's pumps, is simply not enough evidence from which a reasonable jury could find that her use of the premises to sell gasoline was materially interfered with.[7] Plaintiff's leap to deeming the visits a material interference is conclusory, and an affidavit's "conclusory allegations" are "inadequate" to prevent summary judgment. *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020). Thus, Anacostia is entitled to judgment as a matter of law on this theory.[8]

---

[7] For the same reason, Plaintiff has no evidence of damages, another element of a breach-of-contract claim. *See Mawakana*, 926 F.3d at 869.

[8] Plaintiff also claims Anacostia breached an implied duty of good faith and fair dealing by not sharing the proceeds of the Verizon lease with her. Compl. ¶ 37. But the lease expressly reserved for Anacostia the "exclusive right" to revenue generated from Anacostia's other uses of the premises, such as the Verizon lease. *See* ECF No. 60-4 at 34. So Anacostia's retention of that revenue cannot have breached the implied covenant of good faith and fair dealing. *See WMATA v. Quik Serve Foods, Inc.*, Nos. 4-cv-687, 4-cv-838 (RCL), 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006) (an "implied covenant may not override the express provisions of the contract." (quoting *Television Cap. Corp. of Mobile v. Paxson Commc'ns Corp.*, 894 A.2d 461, 468 (D.C. 2006))). Thus, Anacostia is entitled to judgment as a matter of law on this version of Plaintiff's argument too.

### 4.       Rent Deductions and Collections

Plaintiff's fourth theory is that Anacostia breached the lease both by collecting rent before it was due and by collecting more rent than she owed.  Compl. ¶¶ 38–48.  Again, Anacostia contends that Plaintiff has failed to produce "evidence [sufficient] to establish a *prima facie* showing" on the elements of her claim, ECF No. 60-2 at 32, and again, the Court agrees.

Plaintiff identifies no evidence showing what rent payments Anacostia supposedly collected early or exceeding their agreement.  Those claims are found only in her complaint.  *See* Compl. ¶¶ 39–40.  Tellingly, in her opposition, Plaintiff does not even respond to Anacostia's contention that this claim lacks evidence.  More than that, in her statement of facts, Plaintiff *admits* that "the debits [for rent payments] from [her] Bank Account were not premature or for amounts greater than she owed."  ECF No. 68-2 ¶ 45.  In other words, she admits there is no genuine factual dispute on this issue.

Even so, the Court observes that some of Plaintiff's responses to interrogatories relate to this theory.  In one, she says her bank statements show "rent deduction[s] on various days in amounts that are not consistent with the weekly rental payments."  ECF No. 68-3 at 63.  In another, she says her bank statements show "rental debits in various weekly amounts, with some of those debits greater than the weekly amount due."  *Id.* at 65.  Yet she nowhere specifies the "various days" or specific "rental debits" to which she is referring, or how those amounts, if shown, would prove her claim.  Her conclusions that Anacostia deducted rent payments prematurely and in amounts greater than allowed by the lease are therefore "inadequate."  *Camara*, 952 F.3d at 375.  Without more, a reasonable jury could not conclude that Anacostia deducted rent prematurely or exceeding what was owed.  So even setting aside Plaintiff's later concession, Anacostia is entitled to judgment as a matter of law on this theory.

### 5. Termination

Plaintiff's fifth and final theory repackages as a breach of-contract claim her prior claim that Anacostia's termination of the franchise was unlawful. *See* Compl. ¶ 41. But both the lease and the supply agreement permit termination for reasons consistent with the PMPA. ECF No. 60-4 at 44 (lease); *id.* at 65 (supply agreement). So for the same reasons the Court has already held that the termination is lawful, it also holds that it did not breach the lease or the supply agreement. *See also* 15 U.S.C. § 2806(a) (preempting state law in assessing terminations covered by the PMPA). Anacostia is again entitled to judgment as a matter of law.

\*     \*     \*

Each of Plaintiff's five breach-of-contract theories fails as a matter of law. Thus, the Court will grant summary judgment to Anacostia on Count III.

### F. Anacostia Is Entitled to Summary Judgment on Count IV Because the Lease Permitted Anacostia to Lease the Canopy to Verizon

Plaintiff's fourth claim, for unjust enrichment, reprises her theory that Anacostia's lease to Verizon breached the contract between Plaintiff and Anacostia. ECF No. 60-2 at 34–35; Compl. ¶¶ 43–47. But as the Court has already explained above, the contract between Plaintiff and Anacostia permitted Anacostia to lease Verizon the canopy without sharing the proceeds with Plaintiff.

That conclusion dooms this claim too. In the District of Columbia, "[o]ne who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement." *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins.*, 870 A.2d 58, 64 (D.C. 2005) (footnote omitted); *Shaffer v. George Washington Univ.*, 27 F.4th 754, 768 (D.C. Cir. 2022) ("Unjust enrichment will not lie when the parties have a contract governing an aspect of their relation, because a court will not displace the terms of that contract and impose some other duties not chosen by the parties." (cleaned up)).

Plaintiff still argues that the lease's relevant provisions are "not only unjust, but also unenforceable."  ECF No. 68 at 34.  She claims that Anacostia's interpretation of the contract would allow it to "sublease the property to another gas station or for any other use without compensating" her.  ECF No. 68 at 34.  Not so.  Such an action would defy the lease's requirement that "other business uses" do not "materially interfere with [Plaintiff's] authorized use of the Premises."  ECF No. 60-4 at 34.  That stands in contrast to the Verizon lease, for which—as explained above—Plaintiff has failed to present evidence of any material interference with her business.  At bottom, Plaintiff supports her unjust-enrichment claim with only unfounded conclusions and general frustration that Anacostia availed itself of its contractual rights.  Because those contractual rights preclude any unjust-enrichment claim, Anacostia is entitled to summary judgment on Count IV.[9]

## IV.    Conclusion

For all the above reasons, the Court will grant summary judgment for Defendants on all counts.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 31, 2023

---

[9] Because Defendants are entitled to summary judgment on all counts against them, the Court need not consider Defendants argument that Anacostia lacks standing to seek damages.  *See* ECF No. 60-2 at 35–36.